UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE COMMUNITY OF JESUS, INC., ARTS EMPOWERING LIFE, INC., and PERFORMING ARTS BUILDING FOUNDATION, INC.,**<br><br>        Plaintiffs,<br><br>v.<br><br>**DAVID ORTOLANI and ELLEN ORTOLANI,**<br><br>        Defendants. | **Civil Case No.:**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**I.      INTRODUCTION**

1.      The plaintiffs, the Community of Jesus, Inc. ("the Church"), Arts Empowering Life, Inc. ("AEL") and Performing Arts Building Foundation, Inc. ("PABF") (collectively, "the Charitable Organizations" or "Plaintiffs"), file this Complaint against David Ortolani ("David") and Ellen Ortolani ("Ellen") (together, the "Ortolanis") for contribution with respect to any liability any of those Charitable Organizations may be found to have in the lawsuit brought against them in this Court by the Ortolanis' son, Oliver Ortolani, entitled <u>Oliver Ortolani v. Community of Jesus, Inc., et al.</u>, Civil Action No. 1:25-cv-12005 (D. Mass.) ("Oliver's Lawsuit). Plaintiffs AEL and PABF also bring this Complaint against David and Ellen for indemnification based on several indemnification agreements prepared and drafted by Ellen, and executed by David and/or Ellen, expressly agreeing to indemnify AEL and PABF for any damages, costs and attorney's fees incurred as a result of Oliver's participation in a volunteer activities program in which they enrolled him at the site of the performing arts center in Brewster, Massachusetts, which forms the

basis of Oliver's claims against them in Oliver's Lawsuit. In his lawsuit, Oliver claims that while living with his parents in Orleans, Massachusetts, on Cape Cod, by dint of the fact that his parents volunteered him to participate in volunteer activities and home schooling classes at the site of a performing arts center under construction in the neighboring town of Brewster, the Charitable Organizations "forced" him to volunteer, that the putatively "forced" volunteer activities amounted to forcible "child labor," and that by virtue of his parents having enrolled him for these activities the Charitable Organizations are liable to him for "child trafficking," in purported violation of federal and state law.

2. While barely acknowledging ever so cursorily that his parents volunteered him for these activities and executed written waivers, releases, indemnifications and acknowledgements that, among other things, this was entirely voluntary and entirely their decision on his behalf, Oliver claims that he was deprived of appropriate educational benefits, that on occasion he had to run in hot weather wearing uncomfortable shoes, that there were days when he was either cold or wet, and that he worked long hours without appropriate breaks. He claims that on the days when he went to the site (apparently driven there by his parents), he was awakened early in the morning (by his parents), and that he felt the need to be obedient to the adults on the site.

3. Notably, in his lawsuit, Oliver does not identify any individual who supposedly treated him inappropriately. He does not identify any relationship between any such unidentified individual and any of the Charitable Organizations that he accuses of "trafficking" him. He does not identify how it is that any such relationship between any such unidentified individual and any of the Charitable Organizations he has sued makes that entity liable for this unidentified individual's conduct. And he does not identify how it is that any such relationship between any

2

unidentified individual and any of the Charitable Organizations makes <u>all</u> of the Charitable Organizations liable for the unidentified individual's or individuals' conduct.

4. He also does not allege that any of the Charitable Organizations are alter egos of one another. He does not allege that any of the unidentified individuals who engaged in purportedly wrongful conduct were employees or agents of <u>any</u> of the Charitable Organizations, let alone <u>all</u> of them. Nevertheless, in a lawsuit filed exactly six (6) months to the day after his eighteenth birthday, Oliver claims that "the defendants" (i.e., the Plaintiffs in this case) in the aggregate collectively caused him "physical, psychological and economic injuries."

5. The Charitable Organizations assert in the strongest of terms that Oliver's claims are worse than merely false. The facts of which he is well aware (and of which those who filed this claim at a minimum should have been well-aware with reasonable diligence) make it very plain that his allegations are false. The Charitable Organizations will shortly move to dismiss each of Oliver's claims pursuant to Fed. R. Civ. P. 12(b)(6). Nevertheless, because Oliver's Lawsuit has been filed, they are entitled to contribution and indemnification from the Ortolanis.

## II.   FACTS

6. For present purposes, Plaintiffs bring this complaint on two bases. First, and for the reasons set forth in more detail herein, both of Oliver's parents would, at a minimum, be liable to them for contribution and/or as joint tortfeasors for any "harm" that Oliver sustained as a result of his participation in these volunteer and home schooling programs, for breach, <u>inter alia</u>, of their duties of care to their son, were there any truth to his allegations, which there is not. Oliver's parents were the ones who, knowing precisely what this volunteer program entailed in part because they themselves organized it, not only made the deliberate decision to enroll him in this program, but were principal actors in conceiving, organizing and overseeing the program. They made this decision on the basis of their sole judgment that doing so would help Oliver address a series of

3

psychiatric, emotional and behavioral problems that they knew Oliver suffered from throughout his childhood, problems that they as his parents judged would or could be addressed by organizing (as they did) a volunteer and home schooling program on the site of the performing arts center for Oliver, their other sons and a handful of other children. Oliver's parents were principally involved in developing the volunteer activities and the home schooling plan. They organized them. They drove Oliver back and forth from their home in Orleans on Cape Cod "all the way" to the next town, Brewster – a 15 minute walk or a 5 minute bicycle ride – on those days when he participated – so that he could participate in this supposed "forced labor," or arranged for him to be driven back and forth by the parents of other children who were volunteers.

7.     Ellen Ortolani recruited other parents to volunteer their children to be part of the volunteer program and the home schooling program and, indeed, made the decision along with her husband to have their two other sons also participate.[1] On whatever days he went to the site, Oliver was driven there by his parents or at their direction and by their arrangement. On those days he was picked up at the site by his parents or by parents of one of the other children whose parents had enrolled them in the program, and then driven back home to his parents. Often David Ortolani was physically at the site, serving as one of the foremen, and supervising the children on the site, including Oliver. If Oliver was subjected to any "abuse" or "misconduct" of any kind at any time, both of his parents would have known about it; neither ever made any such claims, or did anything to assert that such abuse or misconduct was ever taking place, or, on information and belief, ever informed any of Oliver's medical providers (or anyone else) that he had been abused, subjected to mistreatment or had any issue whatsoever, or ever made any effort to withdraw him from the

---

[1] Oliver's brothers have not made any claims that their participation in this program constituted "child labor" or "trafficking." Nor have any of the others who participated in this program made such claims. The only person who has made such a claim is Oliver.

4

program or correct any issues that existed – <u>had</u> they actually existed. Oliver could have withdrawn from these activities at any time he or his parents wished. At every level, if there were any truth to Oliver's claim that he was "trafficked," it was Oliver's parents, Ellen and David Ortolani, who did the supposed "trafficking," who conceived it, participated in it, organized it and oversaw it. To say that they would be liable for contribution to the plaintiffs if the plaintiffs were liable to Oliver is an understatement.

8. However, it is even worse than that. Not only did Ellen Ortolani organize the volunteer program at the performing arts center in which her sons participated and recruit others to have their children participate, but she also managed the project, monitored the work site's extensive safety plan, drove her son (and her other sons) back and forth to the site, oversaw the program, all for the purpose of enriching the volunteers' lives, and, in the case of Oliver, helping him deal with various psychiatric, emotional, and behavioral issues that he had, without so much as suggesting to anyone that he was being "abused" in some way. Not only did David Ortolani actively help run the program at the site and act as a foreman for the project, but he also supervised Oliver, his other sons and other children at the site, drove his sons back and forth to the site, never suggesting to anyone, including on information and belief Oliver's medical providers, that he was being subjected to "child labor" or "abuse," all the while having decided to actively run the program and enroll his son in it for the purpose of addressing Oliver's psychiatric, emotional and behavioral issues. More even than that, they executed multiple agreements expressly and conclusively demonstrating that <u>they</u> were responsible for Oliver's participation in the program, that it was <u>their</u> decision, and that they as his parents <u>volunteered</u> him for these activities, and that absolutely <u>nothing</u> about Oliver's participation was "forced" or "coerced" or "trafficking."

5

9.  For example, on or about August 8, 2019, David Ortolani entered into the following agreement with AEL, entitled "Release, Indemnity and Assumption of Risk" in connection with his express volunteering of his son Oliver "to participate in the activities of AEL, including but not limited to . . . physical training and assisting in construction of sets and props, and in general the construction, renovation and repair of AEL storage and practice facilities ('Activities')." The full text of the agreement entered into on August 8, 2019 between David and AEL with respect to Oliver's participation in "the Activities at various locations" is as follows:

### Release, Indemnity, and Assumption of Risk

For and in consideration of One Dollar ($1.00) and other good and valuable consideration, this Agreement is made this ___ day of August, 2019, between the undersigned and Arts Empowering Life, Inc., a charitable educational organization with principal offices in Orleans, Massachusetts ("AEL").

1.  I want my child to participate in the activities of AEL including but not limited to all activities of Winter Percussion, Elements Theatre Company, and music and physical training, and assisting in construction of sets and props, and in general the construction, renovation and repair of AEL storage and practice facilities ("Activities"). I understand that the activities are active and physically demanding, and by nature, dangerous, and could result in injury.

2.  I have consulted with, and obtained permission from, my child's physician before participation, and before signing this document. I understand that my child is permitted to participate in the Activities at various locations (the "Facilities") and to borrow and use certain equipment in the Facilities on the condition that I assume all responsibility for all risk of injury while my child is on or about the Facilities, or participating in the Activities.

3.  I have read and fully understand this Agreement. I assume the risk of injury and fully release and discharge AEL and the owners and lessors of the Facilities (including their employees, agents, volunteers, and representatives), from any and all claims, demands, damages, rights of action or causes of action, present or future, whether the same be known, anticipated or unanticipated, resulting from or arising out of Activities, or use of the Facilities. Further, I

> shall indemnify and hold harmless the Owners and their employees, agents, volunteers, and representatives, and anyone else on the Premises, from any and all loss, liability, claim, or expense, including attorney's fees, which they may incur, or to which they may be put as a result of any misrepresentation made by me.

This was signed by David Ortolani and expressly referenced Oliver. See Exhibit 1, attached hereto and incorporated by reference. He executed identical agreements on behalf of his other sons as well.

10. For her part, Ellen Ortolani executed the following agreement on or about December 13, 2019 with AEL, an agreement which she helped prepare and circulate to others to execute on behalf of their children. The agreement expressly referenced Oliver.

### Release, Indemnity, and Assumption of Risk
### (Minor)

> For and in consideration of One Dollar ($1.00) and other good and valuable consideration, this Agreement is made this 13 day of December, 2019, between the undersigned and Arts Empowering Life, Inc., a charitable education organization with principal offices in Orleans, Massachusetts (AEL").
>
> 1. I want my child to participate in the construction of the new performing arts facility for AEL ("Activities"). I understand that construction will involve power tools, ladders, hydraulic equipment, moving vehicles and other danger, is and could result in injury.
>
> 2. I understand that this is on a volunteer basis and that there will be no payment for services. I will instruct my child to operate any tools or equipment in accordance with safety instructions and manuals, and to observe all safety and operation instructions.
>
> 3. I have consulted with, and obtained permission from, my child's physician before participation, and before signing this document. I understand that my child is permitted to participate in the Activities and to borrow and use certain tools and equipment on the condition that I assume all responsibility for all risk of injury while my child is participating in the Activities.
>
> 4. I have read and fully understand this Agreement. I understand that AEL is a charitable organization and that there are statutory limits

> on the liability of such organizations. I assume the risk of injury, and fully release and discharge AEL and the owners and lessors of the tools, equipment and property (including their employees, agents, volunteers, and representatives), from any and all claims, demands, damages, rights of action or causes of action, present or future, whether the same be known, anticipated or unanticipated, resulting from or arising out of Activities.

See Exhibit 2 attached hereto and incorporated by reference. Ellen executed an identical agreement on behalf of her two other minor sons as well.

11. David Ortolani also entered into an agreement with PABF, entitled "Release, Indemnity and Assumption of Risk" dated October 4, 2020 in connection with the express volunteering of Oliver for work relating to "the construction of the new performing arts facility for the Foundation ("Activities") at the construction site at 36 Southern Eagle Cartway, Brewster, MA." The full text of David's October 4, 2020 agreement with PABF, expressly with respect to Oliver is as follows:

> **Release, Indemnity, and Assumption of Risk**
> **(Minor)**
>
> For and in consideration of One Dollar ($1.00) and other good and valuable consideration, this Agreement is made this <u>4th</u> day of <u>October</u> 2020, between the undersigned and the Performing Arts Building Foundation, Inc., a charitable educational organization with principal offices in Orleans, Massachusetts (hereinafter the "Foundation").
>
> 1. I want my child to participate in the construction of the new performing arts facility for the Foundation ("Activities") at the construction site at 36 Southern Eagle Cartway, Brewster, MA ("Site"). I understand the construction will involve power tools, ladders, hydraulic equipment, earth moving equipment, cranes and other construction materials, and other danger, and <u>could result in injury</u>.
>
> 2. I understand that this is on a volunteer basis and that there will be no payment for services. My child will have health insurance in force during all times while working on the Site. I will instruct my child to operate any tools or equipment in accordance with safety

        instructions and manuals, and to observe all safety and operation instructions.

3. I have consulted with, and obtained permission from, my child's physician before participation, and before signing this document. I understand that my child is permitted to participate in the Activities and to borrow and use certain tools and equipment on the condition that I assume all responsibility for all risk of injury while my child is participating in the Activities.

4. I have read and fully understand this Agreement. I understand that the Foundation is a charitable organization and that there are statutory limits on the liability of such organizations. On behalf of my child, I assume the risk of injury, and fully release and discharge the Foundation and the owners and lessors of tools, equipment and property (including their employees, agents, volunteers and representatives), from any and all claims, demands, damages, rights of action or causes of action, present or future, whether the same be known, anticipated or unanticipated, result from or arising out of Activities.

5. I understand that the Site is part of a larger property (with other tenants including charities and publishing activities), and that while my child is on or near the Site, it is for volunteer purposes for the Foundation, and not for any other charity, tenant, business or occupant.

6. I hereby fully and forever release and discharge the Foundation, and its officers, directors, employees, agents, volunteers and representatives, and anyone else participating in the Activities, from any and all claims, demands, damages, rights of action or causes of action, present or future, whether the same be known, anticipated or unanticipated, resulting from or arising out of my child's participation in the Activities. I shall indemnify and hold harmless the Foundation and its officers, directors, employees, agents, volunteers, and representatives, and anyone else participating in the Activities, from any and all loss, liability, claim, or expense, including attorney's fees, which they may incur, or to which they may be put as a result of any misrepresentation made by me.

7. I also acknowledge receipt of the Performing Arts Rehearsal Building Inc. Safety Plan and COVID19 plan and will review these with my child.

<u>See</u> Exhibit 3, attached hereto and incorporated by reference.  He executed identical other agreements with PABF on behalf of his other sons as well.

12. David Ortolani also executed the following agreement with AEL on or about February 28, 2021, expressly with respect to Oliver.

**RELEASE, INDEMNITY, AND ASSUMPTION OF RISK**

1. I want my child, <u>/s/ Oliver Ortolani</u>, to participate in the <u>activities ("Activities") sponsored by sponsored by AEL</u>.  I understand that, as part of these Activities, he or she will be taking part in many programs, <u>including, but not limited</u> to the following: running, arching, calisthenics, playing musical instruments, performances, and other athletic and <u>physically demanding activities.  I understand that some of these Activities, by their nature, could result in injury</u>.
2. I have consulted with, and obtained permission, from my child's physician before participation, and before signing this document.  <u>I understand that my child is permitted to participate in the Activities and to borrow and use certain tools and equipment on the condition that I assume all responsibility for all risk of injury while my child is participating in the Activities</u>.
3. I understand that AEL is a charitable organization, and there are statutory limits on the liability of such organizations.
4. I understand that in permitting my child to participate in the Activities and use AEL equipment, AEL is relying on the truth and accuracy of the statements, promises, and agreements made by me in this Agreement.
5. I hereby fully and forever release and discharge AEL, and all of its different divisions however designated from time to time, including but not limited to: Gloriae Del Cantores, Spirit Winter Percussion, Spirit Fife and Drum, Elements Theatre Company, Mount Tabor Ecumenical Centre, Organists of the Church of the Transfiguration, its officers, directors, employees, agents, volunteers, and representatives, and anyone else participating in the Activities; from any and all claims, demands, damages, rights of action or cause of action, present or future, whether the same be known, anticipated, or unanticipated, resulting from or arising out of my participation in the Activities.  I shall indemnify and hold harmless anyone else participating in the Activities, from any and all loss, liability, claim or expense, including attorney's fees, which they may incur, or to which they may be put as a result of any misrepresentation made by me.

See Exhibit 4 attached hereto and incorporated by reference (emphasis supplied). David executed identical agreements with AEL on behalf of his two other minor sons as well.

13. Quite apart from the fact that these documents dispose of any claim by Oliver that the Charitable Organizations "compelled" or "coerced" or "forced" him to engage in "child labor," or "trafficked" him, and quite apart from the obvious liability for contribution David and Ellen Ortolani have for any judgment against the Charitable Organizations in Oliver's Lawsuit, these documents make clear that David and Ellen Ortolani are each liable to AEL and PABF for indemnification, including but not limited to for the attorney's fees that AEL and PABF have been or will be forced to incur in connection with defending themselves against their son's claims.

### III. PARTIES

14. The Church is a non-profit charitable corporation organized under Massachusetts law, located at 5 Bay View Drive, Orleans, Massachusetts. It is organized to teach and practice Christianity. Its Officers and Directors are a matter of public record, on file with the Secretary of State's Office.

15. AEL is a non-profit charitable corporation organized under Massachusetts law for the purpose of advancing education and the arts, located at 129 Rock Harbor Road in Orleans, Massachusetts. It is entirely distinct from the Church; by way of example only, its Officers and Directors are distinct from those of the Church.

16. PABF is a non-profit charitable organization located at 18 Anchor Drive, Orleans, Massachusetts. It is a supporting organization of AEL under the Internal Revenue Code. It is also entirely distinct from the Church, and its Officers and Directors, by way of example only, do not overlap with those of the Church. It is a supporting organization of AEL.

11

17. David Ortolani, the father of Oliver Ortolani, was until very recently a longtime resident of Orleans, Massachusetts. He has within approximately the last year moved to Idaho, where he now resides with Ellen.

18. Ellen Ortolani, the mother of Oliver Ortolani, was until very recently a longtime resident of Orleans, Massachusetts. She has within approximately the last year moved to Idaho, where she now resides with David.

### IV.   JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over the plaintiffs' claims against David and Ellen for contribution and indemnification pursuant to 28 U.S.C. § 1332. Plaintiffs' claims against David and Ellen Ortolani in this action arise from Oliver's Lawsuit, and in particular from the claims that Oliver has filed in that lawsuit.

20. Venue is proper in this district for the same reason that venue is proper here in Oliver's Lawsuit, because the Charitable Organizations are domiciled in this district, the defendants were domiciled in this district during the time within which the relevant actions took place, and because the events giving rise to this lawsuit occurred within this district.

### V.   OLIVER'S LAWSUIT

21. Oliver alleges that he was "trafficked" from his home in Orleans, Massachusetts, where he lived with his parents and two brothers, to do volunteer "labor" at the site of what is now a performing arts center in the neighboring town of Brewster, Massachusetts, one mile away, and that "the defendants" in Oliver's Lawsuit – i.e., the Church, AEL and PABF, are responsible for this "trafficking." He alleges that he was among a group of children of members of the Church who, for an unidentified period or periods sometime in and following the summer of 2019, "launched a forced labor scheme."

22.     Though Oliver's Lawsuit is composed largely of allegations about the purported "background" and "culture" of the Church, relies entirely on conclusory and "lumped" together assertions about "the defendants" or "Community members" or "Community adults" who are never identified by name, and relies heavily on assertions that things happened but not necessarily to <u>him</u>, one can locate with some effort allegations about things that allegedly happened to <u>him</u> – although without ever identifying a person who did these things, what if any affiliation any such person had with any of the Charitable Organizations or how it is that any such affiliation renders any of the Charitable Organizations liable, let alone <u>all</u> of them.  However, Oliver does allege that he was awakened (presumably by his parents) "between 4:30 and 5:00," "made to do exercise" and "made to do physical work," and "required to be completely obedient" to the adults, whom Oliver does not identify but who are said to be adults who were "members of the Community [of Jesus]."  He alleges that on occasion he was "made to run laps" for four hours on a hot summer day by an unidentified adult.  He alleges that he was not "properly trained on equipment," that he was exposed to concrete dust, that there were occasions when he was cold or wet, and that he received an inadequate educational experience.

23.     He alleges that, as a result of these alleged experiences, he felt hopelessness and despair.  He alleges that as a result he suffered from joint pain.  He alleges that he now believes he has post-traumatic stress disorder, or PTSD, as a result of his volunteer activity at the site, which he contends he was "forced" and "compelled" to participate in by "the defendants."

## VI.    <u>OLIVER ORTOLANI'S LITANY OF MEDICAL, PSYCHIATRIC, EMOTIONAL AND BEHAVIORAL PROBLEMS, AND HIS PARENTS' DECISION TO ENROLL HIM IN A PROGRAM TO HELP HIM WITH THOSE PROBLEMS.</u>

24.     From his early childhood on, Oliver suffered from a litany of medical, psychiatric, emotional and behavioral problems which greatly concerned his parents, and which they sought to

attempt to solve in a number of ways. The physical problems, or the problems of which there seemed to be physical manifestations, included, on information and belief, years of severe abdominal pain of unknown origin, as well as severe joint pain in the neck, back and knee, among other places. He suffered from bouts of chest pain, which were unexplained, for which he saw cardiologists, rheumatologists and other specialists. He complained of severe headaches. These medical issues predated his parents' decision to enroll him in the home schooling program at the performing arts center of which he complains, and, on information and belief, continued thereafter.

25. Starting years before his parents' decision to enroll him in the volunteer program at the site and home schooling there, he exhibited concerning behavioral issues which led his parents to move him in and out of various different schools in order to try to remedy these issues. These issues include, inter alia, bouts of severe anger and aggression towards others, including his brothers, the inability to pay attention and to sustain focus and other problems. On information and belief in 2014, when he was seven years old, his behavioral problems led his medical providers to recommend that he undergo a neuropsychiatric examination and, indeed, on information and belief he did undergo various forms of psychological examinations and treatment, all before the events at issue in this case.

26. Oliver's psychological, emotional and behavioral issues were exacerbated by, and were upon information and belief linked to, marital problems between David and Ellen which at times were very serious.

27. In an effort to find a solution to their son's psychiatric, emotional and behavioral problems, David and Ellen Ortolani conceived that Oliver and their two other sons would spend what they thought would otherwise be unstructured if not idle time in the summer of 2019 in a program, organized by them and a few of their friends, at the performing arts site, where the

Ortolanis and their friends would let the children help the adults, under the adults' close supervision, with light tasks in clearing the yard, doing age-appropriate tasks, and helping the adult volunteers with certain tasks. Thus, for example, the children were shown how to use hammers and nails and other light equipment and how to saw wood. They helped carry materials. They helped install signage.

28. The Ortolanis and their friends arranged on their own to transform this into a home schooling program, formalized and approved by the educational authorities, in which approximately ten children of different ages from about 5 families participated. Adults, including David Ortolani, created a classroom on site in which the children were taught about the properties of various building materials, principles of architecture and construction and the like. There were arts and crafts; there were camping trips. Adults were always supervising the children; indeed, David Ortolani, who was one of the foremen on the site and who was a contractor by trade, was one of those supervising the children, including his three sons.

29. When Oliver was at the site, it was his parents who awakened him, and one or the other of his parents, or the friends of his parents whose children were also participating, who drove him the approximately one mile from Orleans, where the Ortolanis lived, to the next town over, Brewster, where the site was located.

30. Ellen Ortolani in particular played an instrumental role in conceiving of the program, recruiting adults and children to volunteer at the site, scheduling that volunteer work and overseeing the entire project. By way of example only, Ellen was the one who organized volunteers to come to the site and help out with various aspects of the preparation of the site, and to supervise aspects of the preparation of the site by others. She conceived of, organized and oversaw the recruitment of children and adults to help out. She conceived of, organized and

oversaw communications with adults about whether or not they wanted their children to participate in the preparation of the site for constructions and construction itself. She drafted the Job Site Safety Plan for the project and monitored its Safety and Health Program. She scheduled volunteers, both adult and children, for different shifts at the site. She scheduled supervisors to be at the site overseeing the volunteers, both adult and children. She drafted and revised the waivers, releases, acknowledgments and indemnifications for adult volunteers to sign, and for them to sign in particular in connection with volunteering their children on the project – including the very waivers, releases, acknowledgements and indemnification agreements that both she and David signed on behalf of Oliver. Those documents signed by David and Ellen are set forth in full in paragraphs 9-12, supra, and are incorporated by reference.

31.     It was Ellen who conducted fundraising for the project, who prepared and oversaw the budgets for the project, who oversaw staffing and volunteers for the project, who helped ensure compliance with the Job Site Safety Plan and the Safety and Health Program and who oversaw subcontracts for work on the site. It was Ellen who, as a key employee of the architectural design firm which designed the project and of the contracting firm that served as general contractor for the project, was one of the principal managers of the entire project, and was formally recognized as such, in writing.

32.     Ellen was outspoken in her support, admiration and gratitude for AEL, which her son has now accused of "trafficking" and "forced labor," as well as abuse of various kinds. By way of example only, collected and attached hereto as Exhibit 5 is a set of Facebook postings by her dated November 27, 2017; August 9, 2018; November 25, 2018; December 2, 2019 and November 30, 2020, urging people to donate to AEL, which she describes as "a non-profit foundation dedicated to the pursuit of beauty, truth and faith, in the Arts – sharing inspiration and

16

education with people across many nationalities, cultures and traditions." In her December 2, 2019 posting, she thanks people for their support for one of AEL's programs, "a youth organization that for over 15 years has had a huge impact on young people, including my sons." In her November 30, 2020 posting, she praises one of AEL's program's commitment to "teamwork, human connections, conflict resolution, respect, personal responsibility [and] empathy," and states "These values … are being taught to my three teenage sons and countless other young people. As a parent, I'm beyond grateful." See Exhibit 5 hereto.

33. As stated, David was one of the principal foremen on the project, frequently physically present on the site when the volunteers, including the children, including Oliver, were on the site. He and Ellen would have been aware of any complaint or other issues raised by any of the volunteers, including any of the children.

34. At some point in 2020, the summer hours spent on the site progressed into a home schooling program, where a small group of school age children of a few Church members would attend classes in a variety of topics taught by adults volunteering as teachers. Programs in mathematics, in the sciences, in topics relevant to the construction and other topics, were supplemented by such activities as arts and crafts and camping trips. There exist dozens and dozens of photographs, and an endless amount of video, of the children engaged in such activities, smiling, laughing, arms around one another, visibly enjoying what they were doing and one another. The children who participated in home schooling were duly registered with and documented by the appropriate authorities by their parents.

35. Oliver complains that on the days when he went to the site, he was awakened early. On those days, of course, it was David and Ellen who awakened him, David and/or Ellen who either drove Oliver to the site in the next town over to volunteer or for classes, or who arranged

17

for one of the other parents to do so, and David and/or Ellen who picked him up and brought him home, or who arranged for one of the other parents to do so. If there were any issues at school or the site, David and Ellen would have known about them, either from being there, or from hearing about them from one of the other parents, or from Oliver, or from Oliver's brothers, whom they also enrolled in the program. If any such issues arose, David and Ellen failed to alert any of the plaintiffs. If Oliver sustained any form of physical or emotional harm as a result of his experience in the program and home schooling that they arranged for him and volunteered him for, David and Ellen mentioned it to no one, including, on information and belief, any of Oliver's medical providers. David and Ellen were free to withdraw Oliver from these activities anytime they wished. They did not do so. To this day, David and Ellen have said nothing to any of the Charitable Organizations about any harm Oliver suffered as a result of the volunteer/home schooling that David and Ellen arranged for their son, on which they volunteered him for. If any of Oliver's allegations were true, which plaintiffs deny, David and Ellen were not just a substantial cause of any harm to Oliver, and not just a principal cause of such harm. Rather, they were <u>the</u> proximate cause of such harm, given the foregoing.

## COUNT I

**(BY ALL PLAINTIFFS AGAINST DAVID AND ELLEN ORTOLANI)**
**(For Contribution)**

36. Paragraphs 1 - 35 herein are realleged and incorporated herein by reference.

37. If the plaintiffs, or any of them, are adjudged to have any liability to Oliver Ortolani on any basis arising from Oliver's Lawsuit, then David and Ellen, as those solely, or at a minimum substantially (if not primarily) responsible for any harm sustained by Oliver relating to the performing arts center, are liable for contribution and/or as joint tortfeasors, having breached their

duty of care and their fiduciary obligation to Oliver, as a proximate result of which Oliver was harmed, for which David and Ellen are liable to the Charitable Organizations.

## COUNT II

**(BY PLAINTIFF AEL AGAINST DAVID ORTOLANI AND ELLEN ORTOLANI)**
**(For Indemnification)**

38. Paragraphs 1 - 37 herein are realleged and incorporated by reference.

39. By virtue of the indemnification agreements executed by David and Ellen Ortolani referenced in paragraphs 9 - 12 supra and incorporated by reference, David and Ellen Ortolani are liable to AEL for indemnification for all attorney's fees, costs and damages of whatever nature sustained by AEL as a result of Oliver's Lawsuit.

## COUNT III

**(BY PLAINTIFF PABF AGAINST DAVID ORTOLANI)**
**(For Indemnification)**

40. Paragraphs 1 - 39 herein are realleged and incorporated by reference.

41. By virtue of the indemnification agreement executed by David Ortolani referenced in paragraph 11 and incorporated by reference, David Ortolani is liable to PABF for indemnification for all attorney's fees, costs and damages of whatever nature sustained by PABF as a result of Oliver's Lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that judgement enter in AEL's and PABF's favor on Counts II and III herein, and in the event that any of them are found liable to any extent in connection with Oliver's Lawsuit, that judgment be entered in their favor on Count I; that the Court order that defendants pay plaintiffs their attorney's fees, damages and costs in connection with defending themselves against Oliver's Lawsuit and pursuant to the judgments in their favor; and that the Court award plaintiffs such other relief as it may deem fair and just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully hereby demand a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**THE COMMUNITY OF JESUS, INC., ARTS EMPOWERING LIFE, INC., and PERFORMING ARTS BUILDING FOUNDATION, INC.,**

By their attorneys,

  */s/ Jeffrey S. Robbins*
Jeffrey S. Robbins (Bar No. 421910)
Joseph D. Lipchitz (Bar No. 632637)
Bridgitte E. Mott (Bar No. 684770)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA  02116
Telephone: (617) 723-3300
Facsimile: (857) 400-3375
Email:  Jeffrey.Robbins@saul.com
Email:  Joseph.Lipchitz@saul.com
Email:  Bridgitte.Mott@saul.com